## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

JAMES L. GAJEWSKI,
      *Plaintiff*

v.

DOUG COLLINS, SECRETARY, U.S.
DEPARTMENT OF VETERANS AFFAIRS,
      *Defendant*

CIVIL ACTION NO. <u>1:26-cv-981</u>

## COMPLAINT FOR AGE DISCRIMINATION IN FEDERAL EMPLOYMENT

### SUMMARY

*Plaintiff Gajewski ("guy-yeskee") is a 70-year-old physician, hired in 2023 as an Oncology/Hematology Section Chief by the VA in Colorado. In 2024, different management fired him without warning for alleged "failure to meet regulatory requirements," claiming he could not supervise medical students/residents in Medical Oncology because his current board certifications instead were in Hematology and Internal Medicine. This was pretextual: (1) his board certifications were known when hired; (2) the local medical school and its licensing authorities allow experience to substitute for board certification and he had years of prior Medical Oncology work and board certification; and (3) younger peers were treated more favorably. For example, Drs. Maria Amaya and Daniel Bowles supervised Hematology students/residents without current board certification in that subject, while Dr. Alkesh Jani supervised Nephrology students/residents without a current Nephrology board certification.*

*Among harms Dr. Gajewski suffered from the wrongful termination are: (1) extended unemployment; (2) having to sell his Denver house at a loss; (3) having to relocate to Washington State for a job paying some $50k less a year; and (4) the VA's demanding he repay some $29,000 of the relocation incentive it had provided to persuade him to move to Denver.*

## JURISDICTION AND VENUE

1. This Court has jurisdiction under the federal age discrimination law (29 U.S.C. § 633a) and 28 U.S.C. § 1331 (federal question).

2. This venue is appropriate as the events giving rise to the claims primarily occurred at the VA's Eastern Colorado Health Care System, Rocky Mountain Regional Medical Center (Aurora), at a time when Plaintiff resided in the Denver area.

## PARTIES AND SERVICE

3. Plaintiff James L. Gajewski is an individual now living in Washington State, where he works as a physician for the U.S. Department of Defense. He may be contacted by way of his undersigned counsel.

4. Defendant Doug Collins is Secretary of the United States Department of Veterans Affairs and is sued in that official capacity. Service will be by postage-paid certified U.S. Mail to:

    4.1. The Hon. Doug Collins, c/o Office of General Counsel, U.S. Department of Veterans Affairs, 810 Vermont Ave., NW, Washington, DC 20420;

    4.2. Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530; and

    4.3. Civil Process Clerk, Office of the U.S. Attorney for the District of Colorado, 1801 California Street, Suite 1600, Denver, CO 80202.

## ADMINISTRATIVE EXHAUSTION

5. Dr. Gajewski initiated EEO counseling around December 6, 2024, which was within the allowed 45 days from his termination of around October 23, 2024.

6. He filed his EEO Complaint around March 11, 2025, as compared to receiving a Notice of Right to File no earlier than March 6, 2025, so within 15 days.

7. After receiving a notice of further rights around November 17, 2025 and the EEO Report of Investigation ("ROI"), he requested a Final Agency Decision around November 18, 2025.

8. He waited at least 180 days from his March 11, 2025 filing of his complaint (i.e., no earlier than September 7, 2025) for a Final Agency Decision (or other final agency action) before filing this lawsuit, but no such Decision or action has been issued/taken.

9. He also gave the VA at least 60 days from his request for a Final Agency Decision before filing this lawsuit (that date having run in January 2026).

**LEGAL CONTEXT**

10. Under 29 U.S.C. § 633a(a), all "personnel actions affecting employees" of the federal government "shall be made free from any discrimination based on age."

11. A federal employee who suffers age discrimination may, under § 633a(c), bring a civil suit for "such legal or equitable relief as will effectuate the purposes of this chapter."

12. Per paragraph § 633a(b), among potential relief is reinstatement with back pay.

13. A plaintiff prevailing in an age discrimination suit against a federal employer in Colorado also may recover attorney fees, such as under provisions of the ADEA and/or the Equal Access to Justice Act, 28 U.S.C. § 2412(b) (attorney fees recoverable against federal government as if a private party).

## FACTUAL ALLEGATIONS[1]

### The Colorado VA Needed a Hematology/Oncology Section Chief

14. In 2023, the VA posted a Vacancy Announcement for a "Physician – Section Chief, Hematology/Oncology" within its Eastern Colorado Health Care System, to work at its Rocky Mountain Regional Medical Center in Aurora.

   14.1.    There is substantial overlap in these two subspecialties of Internal Medicine, so the two fields often are grouped together.

   14.1.1. Hematology is blood focused, including blood cancers.

   14.1.2. Medical Oncology is solid tumor focused.

15. This was the job Dr. Gajewski would be hired to fill.

16. Beyond standard qualifications for a VA physician, the position was identified as additionally requiring the doctor be "[b]oard eligible or board certified in Hematology/Oncology" [not "Hematology *and* Oncology"] and have a "[s]trong background and ongoing interest in Hematology and Oncology," with "[e]xcellent skills in patient care and teaching as related to internal medicine and Hematology/Oncology." Beyond that, "Preferred Experience" was "2 to 3 years of Hematology/Oncology experience with 1 year of leadership experience."

### Dr. Gajewski Was Well Qualified for the Job

17. Plaintiff James L. Gajewski was well qualified for the job. For example, he:

   17.1.    was licensed to practice medicine since 1986 and licensed in five states;

   17.2.    had current board certification in Hematology (and in Internal Medicine);

---

[1] As with the rest of this pleading, assertions and claims are raised in addition and in the alternative, and based on the limited amount of information available pre-discovery.

17.3. had been board certified in Medical Oncology from 1995-2015;

17.4. had extensive work experience in Medical Oncology;

17.5. served on two national committees for the American Society of Clinical Oncology, served as President for the Oregon Society for Medical Oncology; and

17.6. had a prior fellowship in Medical Oncology.

18. He also had many other professional accomplishments, such as 170 peer-reviewed articles; over 72 abstract presentations; designation as a Master, American College of Physicians; and designation as a Fellow, Royal College of Physicians.

19. He earlier worked for the VA in Palo Alto, California and in Walla Walla, Washington.

20. VA management reviewed Dr. Gajewski's qualifications and board certifications and concluded he was qualified for the job, hiring him to start around September 10, 2023.

21. Among his duties as Section Chief for Medical Oncology/Hematology at the Rocky Mountain Medical Center in Aurora was supervising medical students and residents in Medical Oncology and in Hematology, under agreements between the VA and the University of Colorado School of Medicine (Anschutz Medical Campus in Aurora) and pursuant to a joint appointment as a faculty member at the medical school.

21.1. The school has a combined Hematology Oncology Fellowship Program.

21.1.1. Faculty members are assigned to one department or the other but then supervise students and residents for both subspecialties.

**Dr. Gajewski Is Assigned to Staff Physician Position**

22. Then, effective October 14, 2024, Dr. Gajewski was reassigned to the position of Staff Physician under Hematology/Oncology.

23. The reassignment memo (ROI at 127) represented that his "grade and step will remain the same," his "salary will not change," and his "benefits will remain the same."

24. The memo did not assert the move was based on misconduct or poor performance.

25. Because there was no change in grade, step, or salary, the change was unappealable.

   25.1.   Had the reassignment involved a loss of grade or pay, and asserted professional misconduct or incompetence, he could have appealed it to a Disciplinary Appeals Board of three independent peer physicians.

26. As with the earlier Section Chief position, this Staff Physician position required supervising medical students/residents in work in Hematology and Medical Oncology.

27. The reassignment is understood to have been undertaken at the urging and under the influence of Kristen Hyland, someone not involved in hiring Dr. Gajewski, but who by this time had become the Chief of Medicine/Associate Chief of Staff of Medical Services and who is substantially younger than he is.

### Dr. Gajewski Is Fired Without Advance Notice

28.  Just some nine days after the reassignment, Dr. Hyland gave Dr. Gajewski notice that he was being fired, said to be for "failure to meet regulatory requirements."

29. Reliance on this reason, versus asserting performance or conduct failures, meant this action (like the reassignment) could not be appealed to a Disciplinary Appeals Board.

30. The termination notice claimed that Dr. Gajewski's lack of current board certification in Medical Oncology made him legally unqualified to perform required duties of supervising medical students/residents in the Medical Oncology subspecialty.

31. This was despite the fact that the Staff Physician position had no stricter requirements for board certification than had the Section Chief job.[2]

32. The termination memo asserted the requirement for board certification in the same subspecialty for which a doctor is supervising medical students/residents was based on an April 1, 2020 VA policy and the requirements of ACGME (which sets standards for medical training programs and is addressed further below).

33. It was later learned the justification Dr. Hyland presented to higher management for terminating Dr. Gajewski also relied on a claim that "there was not enough workload to employ a Hematology-only specialist" position (note Dr. Hyland had just gotten Dr. Gajewski reassigned fewer than two weeks earlier).

34. The evidence file put together by Dr. Hyland to support the termination also relied on a May 14, 2024 "Physician Scope of Practice" (ROI 154-58), as addressed below.

### Insistence On Also Having Oncology Certification Was Pretextual

35. First, the "Physician Scope of Practice" Dr. Hyland relied on contradicts her claim that Dr. Gajewski had to be board certified in both Hematology and Medical Oncology.

    35.1.    It says for "Qualifications" the incumbent must be "Board eligible or board certified in Hematology and or Medical Oncology" (ROI 157; emphasis supplied).

36. Second, consider the testimony of Dr. Sara Ashraf, who was the Deputy Chief of Staff at the time Dr. Gajewski was hired for the VA Section Chief job (ROI 66).

    36.1.    She says that, when hiring him, management was aware that he was currently board certified in Hematology and earlier had been in Medical Oncology.

---

[2] If Defendant asserts termination was required because the Staff Physician position had stricter board certification requirements than the Section Chief job did, Plaintiff expects to amend to add a challenge to the reassignment. Plaintiff noted this fact in EEO ROI.

36.2.    She adds that the local VA had a number of doctors supervising students/residents in a specialty or subspecialty for which the physicians were not currently board certified, instead having certification in a related subject and/or substantial work experience in the field in which they supervised.

36.3.    Given Dr. Gajewski's current board certification in Hematology, prior certification in Medical Oncology, and prior work experience in Medical Oncology, Dr. Ashraf saw no obstacle to his supervising students/residents in Medical Oncology.

37. Third, multiple peers of Dr. Gajewski's—but who are substantially younger—lack a current board certification in one of the specialty/subspecialties for which they supervise students/residents, but they were not terminated. For example:

| Doctor | Supervising Students/ Residents In | Lacking Current Certification In | VA Job Status |
|---|---|---|---|
| Gajewski, James (Plaintiff) | Hematology and Medical Oncology | Medical Oncology (lapsed) | fired |
| Amaya, Maria | Hematology and Medical Oncology | Hematology (none) | retained |
| Bowles, Daniel | Hematology and Medical Oncology | Hematology (none) | retained |
| Jani, Alkesh | Nephrology | Nephrology (lapsed) | retained |

38. The point here is not to get his peers fired, but that Plaintiff should have been retained.

39. Fourth, the VA policy Dr. Hyland relied on—VA Handbook 5005/113 Part II, Appendix G2, section 2e—says that "Physicians are generally not required to be board certified for employment in VA," with two exceptions she highlighted:

39.1.	the physician is supervising medical students or residents, in which case "LCME, ACGME, or AOA standards" apply;[3] or

39.2.	the job requires joining a medical school faculty, in which case its requirements for board certification extend to the VA's hiring of the doctor.

40. In other words, the VA only requires current board certification in a specialty/subspecialty for which students/residents are being supervised if the organization setting the program's standards requires it, or the medical school does.

40.1.1. As below, neither was true as to Dr. Gajewski's situation.

41. Fifth, the evidence indicates that Dr. Hyland did not bother to seek input from the University of Colorado medical school to see if it agreed with her view of standards for board certification that were applicable to its faculty supervising students/residents.

42. Dr. Hyland's justification for the termination cites the medical school's qualification requirements as including current certification in the subspecialty or possessing "qualifications judged acceptable to the Review Committee."

42.1.	Dr. Gajewski met this standard, as he had qualifications judged acceptable by the medical school and by the VA when he was hired by them in Colorado.

43. Sixth, the organizations setting medical education standards that were identified by Dr. Hyland do not bar otherwise qualified doctors from supervising students/residents for lack of a current board certification in the specialty/subspecialty being taught.

43.1.	ACGME standards require current certification in the subspecialty or "qualifications judged acceptable to the Review Committee" (ROI 71).

---

[3] ACGME = Accreditation Council for Graduate Medical Education; LCME = Liaison Committee on Medical Education; AOA = American Osteopathic Association.

43.2.      A review of LCME standards does not identify any requirement that prohibits Dr. Gajewski from supervising students/residents in Medical Oncology, given his board certification in Hematology, prior certification in Medical Oncology, and extensive work experience in Medical Oncology.

43.2.1. Instead, it offers only a general statement that "faculty members of a medical school are qualified through their education, training, experience, and continuing professional development…" (ROI 121).

43.3.      Next, looking at AOA standards, they require faculty to have a current medical license and, as to the subspecialty being taught, have had board certification or eligibility in it "at some time in their career" (*id.*).

43.3.1. Previously being certified in Medical Oncology, Dr. Gajewski qualified.

44. <u>Seventh</u>, motive by Dr. Hyland (and others working under her influence) is further revealed by the selection of procedures that precluded Dr. Gajewski from obtaining independent (versus internal) review of the termination.

44.1.      As referenced earlier, the VA uses Disciplinary Appeals Boards (DAB) to handle appeals of major actions, like terminations, against healthcare providers where involving questions of professional conduct or competence.

44.2.      Unlike the narrow internal review offered Dr. Gajewski, a DAB would have granted an appeal to three independent reviewers appointed by the Secretary of Veterans Affairs from a national roster of pre-approved, qualified employees.

44.3.      Using (purported) failure to meet regulatory requirements—rather than directly lodging any accusations about conduct, performance, or competence—Dr.

Hyland limited Dr. Gajewski's due process to a review by Dr. Hyland's second-line supervisor, who is director of the nearby regional management hub ("VISN").

44.4.    Dr. Hyland's approach also allowed termination with no advance notice.

44.5.    If a lack of work, as mentioned by Dr. Hyland, were the true basis, then Dr. Gajewski should have been granted due process under RIF procedures (and would have made no sense for Dr. Hyland to so recently have gotten him reassigned).

45. Additionally:

45.1.    The VA has not explained plausibly why it found Dr. Gajewski qualified to supervise students and residents in Medical Oncology when hired, but suddenly decided he later was disqualified from supervising them as a Staff Physician.

45.2.    Dr. Hyland does not plausibly explain suddenly relying on a VA policy for the termination that had been in effect for some four years: was she unaware of the basic qualifications for physicians she was responsible for overseeing?

45.3.    Nor has the VA explained why the medical school found him qualified to supervise those students/residents, but Hyland concluded he could not teach there.

45.4.    In Plaintiff's job search, potential employers did not identify a requirement that holding a Hematology/Medical Oncology position mandated current board certification in both.

46. Finally, reflecting ill-will, within the month prior to the termination, Dr. Hyland had informed Dr. Gajewski, a senior doctor, that from then on he would be treated like a resident (i.e., someone at the very start of their medical career).

## PERSONS INVOLVED

47. As reflected above, Dr. Kristen Hyland spearheaded the effort to fire Dr. Gajewski.

48. She is substantially younger and was aware of his age range (69 years old at the time).

49. Dr. Hyland persuaded Interim Director Amir Farooqi to sign off on the removal.

    49.1.     He is substantially younger than Plaintiff and was aware of his age range.

50. Dr. Hyland also persuaded the regional (VISN) director, her second-line supervisor, not to overturn the action.

## HARMS SUFFERED BY DR. GAJEWSKI

51. The improper termination caused Dr. Gajewski to suffer considerable financial harm.[4]

52. For example, he was unemployed from around October 24, 2024 until starting work in August 2025 for the U.S. Department of Defense in Tacoma, Washington.

53. This relocation required travel to find and make living arrangements and resulted in sale of his Denver home at a loss.

    53.1.     He expects the related losses to total around $60,000 or more.

54. His salary in Denver was around $324,648/year versus now $274,014, resulting in a loss of around $50,000 per year from August 2025 until eventual retirement.

    54.1.     He also lost benefits such as retirement contributions and health insurance, as well as long-term care insurance that cannot be reinstated.

55. To add insult to injury, the VA has demanded that Dr. Gajewski repay some $29,076 of a relocation bonus, due to leaving the job in Denver earlier than expected.

56. In all, his economic losses are expected to near $500,000 or more.

---

[4] As below, Plaintiff seeks equitable relief in restoring his reputation. Absent an intervening change in law, however, he is not seeking damages for mental anguish or reputational harm.

**FIRST CLAIM FOR RELIEF:**
**AGE DISCRIMINATION IN FEDERAL SECTOR (29 U.S.C. § 633a)**

57. In reliance on the pleadings above, Plaintiff asserts that Defendant, acting through the Department of Veterans Affairs and its management officials, engaged in illegal and intentional age discrimination toward Plaintiff, a federal employee.

58. Plaintiff Gajewski is a member of a protected class, being over age 40, and at the time of the challenged termination being 69 years old.

  58.1.    By contrast, those taking the actions against him—led by Dr. Kristen Hyland—were substantially younger (i.e., more than seven years and potentially by multiple decades) and were aware that he was substantially older than them and older than age 40.

59. Dr. Gajewski was terminated around October 23, 2024 on the pretextual basis that he was required to be board certified in Medical Oncology to supervise medical students and residents in that subspecialty, in willful disregard of his prior years of board certification in Oncology and substantial work experience in that subspecialty.

60. Significantly younger peers (as per the table above) were not fired, though each was lacking current board certification in at least one specialty/subspecialty for which they supervise medical students and residents.

61. There is no plausible explanation for the more favorable treatment shown the younger doctors apart from their age.

62. The termination constituted an adverse action under the age discrimination law, in violation of the statutory requirement that such decisions be free of age discrimination.

63. Age improperly tainted the decision to treat Dr. Gajewski more harshly than peers as to termination; full relief is appropriate as it also was the but-for cause of the disparity.

64. Regardless of the evidentiary standard to be applied, it was met here given the blatantly pretextual justifications for the sudden firing and the clear disparity in treatment.

65. Defendant's violation of the age discrimination law entitles Plaintiff to back pay, reinstatement, equitable, and other relief, as well as recovery of attorney fees, expenses and court costs.

   65.1.    For example, Plaintiff Gajewski seeks retroactive reinstatement to equivalent employment at the Aurora, Colorado VA medical center, with back pay and benefits, along with lost seniority.[5]

      65.1.1. To the extent not retroactively reappointed to the position in Denver, he seeks an award of front pay (e.g., for the around $50k/year salary difference).

   65.2.    He seeks compensation for other economic losses too, such as those associated with selling his home in Denver at a loss, trips to find housing in Washington State, real estate broker fees, and moving his goods out of state.

66. He additionally seeks an award of interest on back pay and benefits, plus post-judgment interest from the day of entry of judgment.

67. Given the spiteful nature and manner of the termination, Plaintiff seeks an injunction against retaliation and to stop further discrimination against him, as without such relief the Defendant—such as by way of Kristen Hyland—can be expected to take further unjustified adverse actions against him, as Dr. Hyland remains in senior management.

68. Plaintiff also requests that the Court make him whole by voiding the VA's demand that it be repaid some $29,076 in relocation incentive funds.

---

[5] Plaintiff alternatively seeks lost past pay under the Back Pay Act (5 U.S.C. § 5596) based on a finding that the termination was an "unjustified or unwarranted personnel action."

68.1.    But for the VA's unlawful termination of him, he would have remained employed with it in Denver through the required additional year of service.

69. To help restore his reputation from having been fired, Plaintiff requests that the court order Defendant to post on its website for the Eastern Colorado Health Care System a notice that it has been found to have intentionally discriminated against Dr. Gajewski in violation of federal law and apologizes to him for it.[6]

70. Plaintiff also seeks an award of reasonable and necessary attorney fees, expenses, and court costs, whether under the ADEA; the Equal Access to Justice Act, 28 U.S.C. § 2412(b) (attorney fees recoverable against federal government to same extent as a private party under applicable statute); both, or otherwise.[7]

71. Plaintiff seeks such other and further relief to which the court may find him entitled.

**PRAYER**

72. Plaintiff Gajewski seeks the legal and equitable relief described above, among which is retroactive reinstatement with back pay and benefits, recovery of the costs associated with relocating for a new job, voiding of the attempted clawback of the relocation incentive under which he moved to Denver, and an award of attorney fees, expenses, and court costs. Also any other found by the court to be appropriate.

73. As a start on repairing damage to his professional reputation, he also asks the court order the local VA to post an apology.

---

[6] *See, e.g., Villescas v. Abraham,* 285 F. Supp. 2d 1248, 1257 (D. Colo. 2003) (on remand, requiring defendant to issue apology in federal employee age discrimination case).
[7] *See Craig v. O'Leary,* 870 F.Supp. 1007, 1010 (D. Colo. 1994) (fee award found supportable under ADEA or EAJA); *Villescas,* 285 F.Supp.2d at 1257 (D. Colo. 2003) (on remand, awarding ADEA fees of over $152,000 to federal employee plaintiff).

Respectfully Submitted,

SCHLEICHER LAW FIRM, PLLC
510 Austin Ave., Ste. 110
Waco, TX 76701
254-776-3939 telephone

BY:   /s/ David R. Schleicher
        David R. Schleicher
        david@gov.law


COUNSEL FOR PLAINTIFF GAJEWSKI